UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Michael Busch and Dawn Busch,

          Plaintiffs,

vs.

Corey Welchlin, D.O. and
Fairmont Orthopedics and
Sports Medicine, P.A., d/b/a
Center for Specialty Care,

          Defendants.

**COMPLAINT**

**JURY TRIAL REQUESTED**

---

For their Complaint, Plaintiffs Michael Busch and Dawn Busch hereby state and allege as follows:

## INTRODUCTION

1. This is a medical malpractice lawsuit brought against Defendants Corey Welchlin, D.O. (Hereinafter "Dr. Welchlin") and Fairmont Orthopedics and Sports Medicine, P.A., d/b/a Center for Specialty Care (hereinafter "Center for Specialty Care") and arising as the result of hip surgery performed upon Plaintiff Michael Busch by Dr. Welchlin on March 15, 2010 and the treatment which followed that surgery.

## PARTIES

2. Plaintiffs Michael Busch and Dawn Busch reside at 1022 7TH Ave., Brookings, South Dakota.

3. Defendant Center for Specialty Care is a professional association organized and existing pursuant to the laws of the State of Minnesota located at 717 S. State Street, Fairmont,

Minnesota, and engaged in providing medical care and services to members of the public.

4. Defendant Corey Welchlin, D.O. is a principal and/or employee of Defendant Center for Specialty Care engaged in the profession of providing medical care and services to members of the public, and upon information and belief, resides in Minnesota.

## JURISDICTIONAL STATEMENT

5. The parties are citizens of different states and the amount in controversy exceeds $75,000. The court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, based upon diversity of citizenship of the parties.

## FACTUAL BACKGROUND

6. On March 15, 2010, Dr. Welchlin performed surgery on Plaintiff Michael Busch at the South Central Surgical Center in Fairmont, Minnesota. The surgery was described as "hip replacement on the right/total hip arthroplasty with Birmingham hip resurfacing" (hereinafter "Birmingham procedure"). Dr. Welchlin's web site describes the Birmingham procedure as an alternative to total hip replacement which requires the insertion of a Birmingham Hip Resurfacing device consisting of a cup which replaces the socket and a cap which slides over the femoral head with a hip stem placed down the shaft of the femur. Dr. Welchlin's web site further links to a patient information paper produced by the Smith & Nephew, Inc. which states that most Birmingham procedure patients are hospitalized for 4-6 days, after which they use a cane or crutches for approximately 6 weeks. Further, prior to discharge a physical therapist will instruct the patient how to climb stairs, how to move from the bed, a chair and a car. The physical therapist may also give the patient exercises to do at home everyday and instruct how to avoid bending the hip or waist to more than a 90 degree angle during the healing period.

7. Dr. Welchlin did not hospitalize Mr. Busch during or following the Birmingham procedure. Mr. Busch was informed that he was free to leave when he felt up to it and Mr. Busch was allowed to leave the surgery center within hours after the procedure. Prior to his departure a nurse gave written discharge instructions and told him to read through them and call if he had any questions. No one instructed Mr. Busch how to care for his surgical wound. He did not see a physical therapist and no one instructed him how to climb stairs, how to move from the bed, a chair and a car or anything else. No one discussed exercises to do at home everyday and how to avoid bending the hip or waist to more than a 90 degree angle during the healing period. No one provided him with a cane or crutches or instructed him to obtain and use those devices.

8. Prior to the surgery on March 15, 2010, Dr. Welchlin did not discuss or inform Mr. Busch that he did not intend to follow the guidelines and recommendations for hospitalization and post-operative care listed and discussed in the patient information paper produced by the Smith & Nephew, Inc.

9. Within days after the Birmingham procedure the Plaintiffs observed that the incision site was red and felt hot to the touch. There was also drainage that appeared to be a light bloody/yellowish color. On March 20, 2010, Mrs. Busch called the Center for Specialty Care and a nurse informed her that those conditions were not unusual and they should just keep an eye on the site. In the days that followed the Plaintiffs continued to watch the wound drain through dressings, clothing and towels.

10. On March 25, 2010, Mr. Busch was seen by Center for Specialty Care employee Tim Soelter, PA-C (hereinafter "PA Soelter") in Pipestone, Minnesota. Mr. Busch reported increased drainage from his surgical wound. PA Soelter's impression included possible early infection. He started Mr. Busch on the oral antibiotics and instructed Mr. Busch to

check in early the next week to let him know if the wound was drying up. Mr. Busch was also instructed to return in one month for a recheck or sooner if needed.

11. On March 27, 2010, the Plaintiffs called and spoke with a nurse at the Center for Specialty Care. They informed her that Mr. Busch was having significant drainage going though dressings, pants and towels and that there must be something wrong. The nurse scheduled an appointment for Mr. Busch in Pipestone, Minnesota, on March 30, 2010.

12. On March 30, 2010, Mr. Busch was examined by both Dr. Welchlin and PA Soelter in Pipestone, Minnesota. The chart note states that Mr. Busch has had some wound drainage for the last 5 days and has a well healed incision with some serosanguineous discharge. Blood was drawn and send to the lab at Pipestone County Medical Center. The antibiotics were continued and Dr. Welchlin planned to see Mr. Busch again on April 1, 2010, when Dr. Welchlin was in Pipestone again.

13. On April 1, 2010, Mr. Busch received a call from a nurse at the Center for Specialty Care who informed him that the blood samples showed infection and he needed a second surgery.

14. On April 2, 2010, Dr. Welchlin performed a second surgery consisting of irrigation and debridement of the right hip. Mr. Busch was released the same day with instructions to have a PICC line placed for IV antibiotic therapy upon his return to his home in Brookings, South Dakota. After his return to Brookings that day Mr. Busch continued to have a significant amount of drainage from the wound.

15. On April 3, 2010, Mr. Busch presented at the Brookings Hospital where a PICC line was placed and he started IV antibiotic therapy (Vancomycin).

16. On April 8, 2010, Mr. Busch was seen by PA Soelter in Pipestone. Mr. Busch reported that he was still having a fair amount of drainage, about 50 cc every half day. The plan was

to keep Mr. Busch on IV therapy and return 5 days later on April 13, 2010. Upon his return home after this visit Mr. Busch was experiencing significant bleeding from the wound. He called and spoke with a nurse at the Center for Specialty Care. He asked the nurse how he was supposed to keep up with all of the bleeding. She instructed him to keep packing on more dressing and leave it in place.

17. Mr. Busch continued with IV antibiotic (Vancomycin) therapy at Brookings Hospital from April 8, 2010 to April 12, 2010.

18. On April 13, 2010, Mr. Busch was seen by PA Soelter in Pipestone. Mr. Busch continued to experience significant drainage and PA Soelter's impression was wound infection. He noted the need to reschedule Mr. Busch for another irrigation and debridement and the use of antibiotic beads. He also ordered the addition of Rocephin as part of the IV antibiotic therapy.

19. Mr. Busch had IV antibiotic (Vancomycin and Rocephin) therapy at Brookings Hospital on April 13, 2010 to April 14, 2010.

20. On April 15, 2010, Dr. Welchlin performed a third outpatient surgery consisting of an irrigation and debridement of the right hip. He ordered continued IV antibiotic therapy with Vancomycin and Rocephin, as well as Tobramycin beads, with follow-up in 10-14 days.

21. Mr. Busch continued to have IV antibiotic (Vancomycin and Rocephin) therapy at Brookings Hospital from April 16, 2010 to April 20, 2010.

22. On April 20, 2010, Mrs. Busch called a nurse at the Center for Specialty Care and reported that Mr. Busch was bleeding heavily and she was worried about him. She asked for Dr. Welchlin's phone number. The nurse said she would call Dr. Welchlin and get back to Mrs. Busch. The nurse called back later and told Mrs. Busch that she could not reach Dr.

Welchlin. The nurse told Mrs. Busch to go to the Brookings Hospital to have Mr. Busch's blood level checked.

23. On April 20, 2010, Mr. Busch presented to the ER at Brookings Hospital where it was noted that there was open draining of the right hip wound. The ER doctor suggested that Mr. Busch call his doctor to discuss other treatment options and that he may want to obtain a second opinion.

24. After returning home from the ER at Brookings Hospital Mrs. Busch called a nurse at the Center for Specialty Care and the nurse told her she would have Dr. Welchlin call. Dr. Welchlin called at approximately 10 pm that night. He told Mrs. Busch that he wanted to perform surgery again nine days later on April 29, 2010. He told Mrs. Busch that he needed to take everything out and that he felt "really bad'. Dr. Welchlin said the infection "just got away from him". Mrs. Busch told Dr. Welchlin that she would speak to Mr. Busch about the matter. Dr. Welchlin called again at 10:30 pm and spoke with Mr. Busch, who told Dr. Welchlin that they did not feel comfortable having Dr. Welchlin perform a fourth surgery and were going to find another doctor.

25. On April 21, 2010, Mr. Busch was examined by Dr. Corey Rothrock, who recommended removal of the right hip hardware.

26. On April 22, 2010, Mr. Busch was admitted to Avera Mekennan Hospital where Dr. Rothrock performed surgery described as irrigation and debridement of the right hip, removal of deep implant and placement of antibiotics spacer for staged revision of the right hip. Mr. Busch was discharged six days later on April 28, 2010.

27. On June 29, 2010, Mr. Busch was admitted to Sanford USD Medical Center where Dr. Rothrock a total right hip arthroplasty revision with removal of deep spacer. He was discharged 3 days later on July 2, 2010.

## CLAIM - NEGLIGENCE

28. Dr. Welchlin was negligent in the care and treatment he provided to the Mr. Busch.

    Examples of such negligence include, but are not limited to, the following:

    a. Performing a total hip replacement on an outpatient basis;
    b. Failure to instruct Mr. Busch regarding post-operative care;
    c. Failure to promptly diagnose Mr. Busch's post surgery infection;
    d. Failure to recognize the severe nature of Mr. Busch's infection and the need for prompt treatment;
    e. Failure to properly treat Mr. Busch's infection; and
    f. Failure to hospitalize Mr. Busch so he could receive proper treatment for his infection.

## CLAIM - FAILURE TO OBTAIN INFORMED CONSENT

29. Plaintiffs reallege the allegations contained in paragraphs 1 though 29.

30. Mr. Busch was not informed prior to the Birmingham procedure that Dr. Welchlin did not intend to follow the guidelines and recommendations for hospitalization and post-operative care listed and discussed in the patient information paper produced by the Smith & Nephew, Inc. and which was linked to Dr. Welchlin's own web site.

31. Dr. Welchlin knew or should have known that a reasonable person in Mr. Busch's position would regard the information to be significant.

32. A reasonable person in Mr. Busch's position would not have proceeded with the surgery if he had been provided with the information prior to surgery.

33. The undisclosed information was in part a direct cause of the damage to the Plaintiffs.

## DAMAGES

34. As a direct result of Dr. Welchlin's negligence and failure to obtain Mr. Busch's informed consent, Michael Busch sustained loss and damage including, but not limited to the following:

   a. Permanent bodily injury;
   b. Past and future medical expenses;
   c. Past and future disability;
   d. Past and future loss of earnings and diminution of earning capacity; and
   e. Past and future physical, mental and emotional pain.

34. Plaintiff Dawn Busch is the wife of Plaintiff Michael Busch. As a result of the serious injuries sustained by her husband, she has been deprived of his services, society and companionship.

**WHEREFORE**, Plaintiffs requests a JURY TRIAL and that this Court grant relief as follows:

35. Awarding judgement in favor of the Plaintiffs against the Defendants and each of them jointly and severally for compensatory damages in an amount exceeding Seventy Five Thousand and no/100 Dollars ($75,000.00).

36. Awarding the Plaintiffs costs and disbursements incurred herein.

37. For such other and further relief as the Court finds just and equitable.

M. A. ZIMMER LAW

Dated: /-27-12

By _____
Michael A. Zimmer (#141811)
Attorneys for Plaintiffs
88 South 10th Street, Suite 300
Minneapolis, Minnesota 55403
612-746-5546

# M. A. Zimmer Law

A Professional Corporation

A Personal Injury Law Firm

Michael A. Zimmer, Attorney
Certified Civil Trial Specialist*

Admitted to practice in
Minnesota
Wisconsin
Arizona

January 27, 2012

Filing Division
United States District Court
District of Minnesota-Fourth Division
U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415

Re: Michael Busch and Dawn Busch v. Corey Welchlin, D.O. and Fairmont Orthopedics and Sports Medicine, P.A., d/b/a Center for Speciality Care

Dear Clerk:

Enclosed for filing please find the following:

1. Complaint;
2. Summons in a Civil Action;
3. Civil Cover Sheet; and
4. Filing Fees in the amount of $350.00 made payable to the Clerk of Court.

Very truly yours,

Michael A. Zimmer

MAZ/bhb

Enclosures

cc: Michael Busch and Dawn Busch

88 South Tenth Street • Suite 300 • Minneapolis, MN 55403
Phone: 612.746.5546 • Fax: 612.333.2763 • mazimmer@mazimmerlaw.com

*Certified as a Civil Trial Specialist by the Minnesota State Bar Association Board of Legal Certification
Certified in Civil Trial Advocacy by the National Board of Trial Advocacy